UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

SALLY SPINOSA,

Defendant.

21 CR 206 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion by the Government to access written communications based on the crime-fraud exception to the attorney-client privilege. Defendant Sally Spinosa ("Spinosa") is charged with submitting false claims, in violation of 18 U.S.C. § 287; wire fraud, in violation of 18 U.S.C. § 1343; and aggravated identity theft, in violation of 18 U.S.C. § 1028A. These charges arise from Spinosa's having allegedly misrepresented the extent of her work at the Fresh Kills Landfill (the "Landfill") to enable her to obtain benefits from the September 11th Victim Compensation Fund. The Government now seeks an order compelling production of written communications between Spinosa and her attorneys at Barash McGarry Salzman & Penson ("BMSP"), the law firm that submitted her claims and advised her in the benefits application process. To justify withholding these materials, BMSP invoked attorney-client privilege and work-product privilege. The Government argues that these documents are subject to the crime-fraud exception to those privileges, and thus are not properly withheld. It moves that these materials either be produced to the Government, or to the Court for *in camera* review. Spinosa opposes this motion. For the reasons that follow, the Court grants the

Government's motion to the extent it seeks the production of the withheld materials for the Court's *in camera* review to determine which materials fall under the crime-fraud exception.

## I.    Background

### A.    Factual Background[1]

#### 1.    The Victim Compensation Fund and the World Trade Center Health Program

In the wake of the terrorist attacks of September 11, 2001, Congress established the September 11th Victim Compensation Fund ("VCF") and the World Trade Center Health Program ("WTCHP") to provide compensation and medical support to persons harmed or killed by the attacks.  Compl. ¶¶ 5, 6(a).  The VCF initially operated between 2001 and 2004 and has continuously operated since 2011; in addition to providing compensation for death or immediate physical harm caused by the attacks, it compensates persons exposed, between September 11, 2001, and May 30, 2002, to hazardous conditions at certain toxic sites.  *Id.* ¶ 6(a)–(b).  The WTCHP provides monitoring and medical-treatment benefits to persons who developed adverse health conditions after exposure to hazardous conditions associated with the attacks.  *Id.* ¶ 7(a).

To qualify for VCF compensation stemming from hazardous exposure, a claimant must show: (1) a qualifying medical condition; and (2) sufficient presence at an enumerated hazardous site.  *Id.* ¶ 6(b).  A claimant may verify her eligibility for such compensation either through the "private physician" route or the "WTCHP" route.  *Id.* ¶ 6(c).  In the former, a private physician verifies the claimant's medical eligibility, and the VCF verifies her presence eligibility.  *Id.*  In

---

[1] This factual account draws primarily from the Complaint, Dkt. 1 ("Compl."), the Indictment, Dkt. 14 ("Indictment"), the Government's memorandum of law in support of its motion and exhibits attached thereto, Dkt. 29 ("Gov't Mem."), and Spinosa's opposition, Dkt. 30 ("Spinosa Opp'n").  Certain non-privileged communications between individuals at BMSP and Spinosa were produced in response to the Government's subpoena and are attached to its motion.

the latter, the WTCHP independently verifies both the medical and presence elements. *Id.* ¶¶ 6(c), 7(c)–(e). Upon certifying eligibility, the WTCHP provides the claimant with a Certification Letter, which the claimant may transmit to the VCF to establish eligibility for compensation. *Id.* ¶ 7(e). The VCF then calculates a monetary award based on the claimant's specific medical condition and its severity. *Id.*

Relevant here, a claimant under either route must establish her presence at an enumerated hazardous post-attack site to qualify for monetary compensation. Both the VCF and WTCHP require at least two "proof-of-presence" documents supporting the claimant's presence at an enumerated hazardous site during the covered period. *Id.* ¶ 6(b). Among the enumerated sites is the Landfill in Staten Island. *Id.* The VCF also requires that the claimant have been present at the hazardous site for a minimum number of hours. *Id.* The WTCHP Guidelines determine the required number of hours. Requirements depend on the hazardous site's location, the period when the claimant was present, and the volume of visible debris at the site. *Id.* ¶ 6(b) & n.2.

### 2. Spinosa's Career at the NYPD

Between July 1986 and July 2019, Spinosa was an officer in the New York City Police Department ("NYPD"). *Id.* ¶ 8(a). Between January 2000 and July 2019, she worked as a Sergeant in the Patrol Services Bureau of Staten Island's Investigations Unit. *Id.*

Between August 24, 2001 and December 25, 2001, due to pregnancy, Spinosa was placed on "limited duty." *Id.* ¶ 8(b). Officers on limited duty perform most of their work at the office and little to no work on patrol or in the field. *Id.* Spinosa gave birth on February 6, 2002. *Id.* Between December 26, 2001 and April 22, 2002, Spinosa was fully on leave and not performing any work for the NYPD. *Id.* ¶ 8(c).

### 3. Spinosa's VCF and WTCHP Claim Submissions

The Complaint alleges that, on or about April 6, 2010, Spinosa participated in a WTCHP Exposure Assessment interview, *id.* ¶ 10(a), during which she claimed to have participated in the "WTC rescue and recovery effort from September 12, 2001, to September 1, 2002," *id.* ¶ 10(a)(i). That year-long period includes 222 days during which Spinosa was on limited duty or full leave. *See id.* ¶¶ 8(b)–(c). According to the Complaint, Spinosa represented that she worked at a hazardous site for an average of two hours per day, for a total of 260 hours. *Id.* ¶ 10(a)(ii). Her work purportedly brought her into contact with human remains, mold, and chemicals. *Id.* ¶ 10(a)(iv). Spinosa claimed that she did not always have access to personal protective equipment such as masks, respirators, and gloves. *Id.* Spinosa was also examined by a WTCHP physician, who recorded, apparently based on information supplied by Spinosa, that Spinosa had worked for 12 months in landfills on Staten Island. *Id.* ¶ 10(b).

On or about July 11, 2010, the WTCHP conducted a telephone intake interview with Spinosa. *Id.* ¶ 10(c). The WTCHP records of this interview contradict Spinosa's earlier representations in several respects. They state, *inter alia*, that Spinosa did not work at the Landfill between September 11 and 14, 2001, and that she worked a total of 320 hours between January 1 and July 31, 2002. *Id.*

On or about October 24, 2011, Spinosa again met with a WTCHP physician. *Id.* ¶ 10(d). The physician's records reflect Spinosa's claim to have worked as a supervisor at the "Arthur Kill Landfill" between September 18, 2001, and March 2002. *Id.*

On June 27, 2014, Spinosa submitted a VCF claim (the "2014 VCF Claim") for compensation for non-economic losses through BMSP. *Id.* ¶ 10(e). BMSP submitted forms, affidavits, and other supporting documents to the VCF on Spinosa's behalf, principally through the VCF's online portal. *See id.* ¶¶ 10(e), 15(d), 25; Gov't Mem. at 9. Spinosa represented that

she had worked at the Landfill for two hours per day each day between September 20 and November 20, 2001. Compl. ¶ 10(f). As a result, Spinosa claimed, she developed, *inter alia,* asthma, gastroesophageal reflux disorder ("GERD"), and chronic sinusitis. *Id.* She attested that all information and documents included with the claim were "true and accurate" to the best of her knowledge. *Id.*

On September 15, 2014, Spinosa submitted two proof-of-presence documents: (1) a notarized affidavit purportedly from an officer ("Officer-1") who had "frequently visited" the Landfill with Spinosa between September 11, 2001 and September 11, 2002, and had gone to the Landfill with her to "supervise subordinates"; and (2) an affidavit from another officer ("Officer-2"), attesting to having personally witnessed Spinosa at the Landfill and made "numerous visits" there with her. *Id.* ¶¶ 10(g)–(h). Officer-1 was a supervisor in the Staten Island Investigations Unit in 2001 and 2002, where he supervised Spinosa. *Id.* ¶ 22(a). Officer-2 was allegedly in a romantic relationship with Spinosa at the time he signed the affidavit. *Id.* ¶ 10(h). According to the complaint, Spinosa submitted both affidavits to the VCF through BMSP. *See id.* ¶¶ 25–27; *see also* Gov't Mem. at 3–4.

On August 13, 2015, a BMSP administrator emailed Spinosa to remind her that her 2014 VCF Claim application was pending through the "private physician" route, and to ask her to notify BMSP whether her medical conditions had been certified by the WTCHP. Compl. ¶ 11(a); Dkt. 29-5 ("Aug. 2015 Email"). The administrator explained that "[t]he ultimate goal is to have [Spinosa's] conditions found eligible by the VCF through one of the above processes," and that once Spinosa's eligibility had been established, her claim would proceed to the compensation stage. Aug. 2015 Email.

On or about October 21, 2015, the VCF denied Spinosa's 2014 VCF Claim for failure to meet the hours threshold necessary to establish presence. Compl. ¶ 10(i). Based on Spinosa's description of the Landfill, the VCF concluded that she would need to show at least 24 hours of presence between September 15 and 30, 2001, or at least 160 hours between September 15, 2001 and July 31, 2002, to qualify, but had not done so. *Id.*

On July 25, 2016, the same BMSP administrator emailed others at BMSP to ask whether they had spoken to Spinosa regarding the denial. *See* Compl. ¶ 11(b); Dkt. 29-6 ("July 2016 Email"). The administrator stated that she was "sending [Spinosa] a letter today and requesting she enroll in the WTCHP." July 2016 Email.

The Complaint alleges that, on or about January 31, 2017, Spinosa met with a physician authorized to make certifications for the WTCHP. Compl. ¶ 12(b). The physician's practice was to rely on the WTCHP exposure assessment and not to conduct any independent investigation as to exposure. *Id.* ¶ 13. Records from the WTCHP and the physician reflect that Spinosa told the physician that she "was at the [Fresh Kills] Landfill for 4–5 months" and "was never given a mask." *Id.* ¶ 12(b). The physician ordered a number of tests for Spinosa; on May 22, 2017, Spinosa returned to meet again with the physician. *Id.* On July 11, 2017, the physician completed a WTCHP Physician Determination Form. *Id.* ¶ 12(c). He concluded, "[b]ased on a reasonable degree of medical certainty," that Spinosa's exposure to "airborne toxins" and other hazards contributed to or aggravated her asthma and chronic rhinosinusitis, and that Spinosa "had sufficient exposure under the WTCHP Guidelines." *Id.* ¶¶ 12(c)–(d). The physician therefore recommended that Spinosa's asthma and rhinosinusitis conditions be certified by the WTCHP. *Id.* ¶ 12(c).

On or about August 2, 2017, the WTCHP certified Spinosa's asthma and chronic rhinosinusitis for medical benefits. *Id.* ¶ 12(f). On or about February 13, 2018, Spinosa met again with the physician about her GERD. *Id.* ¶ 12(g). On or about July 10, 2018, the physician completed a WTCHP Physician Determination Form recommending that her GERD also be certified. *Id.* On or about August 8, 2018, the WTCHP issued a second letter certifying Spinosa's GERD for benefits. *Id.* ¶ 12(h). Between November 2017 and in or about April 2018, the WTCHP paid for three of Spinosa's medical visits, and between October 2017 and April 2020, the WTCHP paid for certain prescription medications. *Id.* ¶ 14.

Spinosa also renewed her previously denied VCF claim. *Id.* ¶ 15. On August 11, 2017, Spinosa submitted a "conditions amendment," asking the VCF to reconsider her claim in light of the WTCHP certification of her asthma and chronic rhinosinusitis. *Id.* ¶ 15(b). Indeed, the VCF's usual practice was to rely on WTCHP determinations in considering claimant eligibility. *Id.* ¶¶ 7(e), 15(b). On August 28, 2018, Spinosa submitted a second conditions amendment, which included the WTCHP certification of her GERD. *Id.* ¶ 15(c). The Complaint alleges that VCF records show that both the 2017 and 2018 "conditions amendments" were submitted by BMSP through the VCF online portal. *Id.* ¶ 15(d). As of the filing of the Complaint, Spinosa's VCF claim was still pending. *Id.* ¶ 15(e).

### 4. Spinosa's Alleged Misrepresentations to the VCF and WTCHP

The Complaint alleges that Spinosa, in the above submissions, made misrepresentations to the VCF and the WTCHP. *Id.* ¶ 16. Specifically, it alleges that Spinosa materially overstated "the time that [she] spent at the [Fresh Kills] Landfill" in the aftermath of the September 11 attacks, and included a fraudulent "proof-of-presence" document. *Id.*

First, the Complaint alleges, Spinosa's representations regarding her hours worked at the Landfill were false. It notes that Spinosa's claims were internally inconsistent: for example, she

claimed in her 2010 Exposure Assessment to have worked 260 hours in the Landfill and in her 2014 VCF claim to have worked 124 hours there. *Id.* ¶ 16. Further, the Complaint notes, Spinosa, as a result of her pregnancy, was on limited duty between August 24, 2001, and December 25, 2002. *Id.* ¶ 17. Limited duty officers fulfill almost exclusively in-office duties, and Spinosa's supervisors did not recall sending her to the Landfill. *Id.* ¶¶ 17–23. One of her supervisors also attested that the Landfill was considered a toxic environment, unsuitable for persons at heightened medical risks, including pregnant persons. *Id.* ¶¶ 23(a)–(b). Additionally, Spinosa's unit did little work at the Landfill during the relevant period. *Id.* ¶¶ 20–22. And there are no entries in the surviving[2] "movement logs" kept by Spinosa's office reflecting that Spinosa ever left the office for the Landfill. *Id.* ¶¶ 18(b)–(d).

Second, the Complaint alleges, Spinosa submitted a fraudulent affidavit from Officer-1 through BMSP. *Id.* ¶ 25. In 2007, Spinosa contacted Officer-1 to discuss his signing a proof-of-presence document for her. *Id.* ¶ 26(a). Officer-1 asked Spinosa to provide support for her asserted presence at the Landfill; she did not approach him again. *Id.* Officer-1 attests that he did not often visit the Landfill with Spinosa, or visit it with her to "supervise subordinates." *Id.* ¶ 26(c). Officer-1 denies signing the affidavit, attests that the handwriting on the affidavit does not match his, and acknowledges that although he knows the notary who notarized the affidavit, he had not seen the notary for many years before 2014. *Id.* ¶¶ 26(b)–(d).

## B. Procedural History

On July 3, 2019, the Government issued a grand jury subpoena to BMSP seeking documents and records concerning its representation of Spinosa in connection with her VCF and

---

[2] The movement logs for between September 20, 2001, and November 20, 2001 "no longer exist." Compl. ¶ 18(b).

WTCHP applications. Dkt. 29-2 ("Subpoena"). On July 29, 2019, BMSP responded. Dkt. 29-3 (production cover letter). Although it produced numerous documents, BMSP withheld others pursuant to the attorney-client and work-product privileges and withheld an additional document pursuant to the doctor-patient privilege. Dkt. 29-4 ("Priv. Logs"). Relevant here, BMSP refused to disclose email correspondences with, and internal emails pertaining to, Spinosa. *See id.*; *see also* Gov't Mem. at 8. The privilege logs identify 51 documents withheld by BMSP pursuant to privilege, although some are duplicates. Priv. Logs; Gov't Mem. at 2 n.2.

On January 6, 2021, the Government filed the sealed Complaint. On March 25, 2021, a grand jury returned the Indictment as described above. On March 30, 2021, the Court held an initial conference. Dkt. 25.

On May 14, 2021, the Government moved to compel production of the documents withheld under the crime-fraud exception to the attorney-client and work-product privileges and the single document withheld under the doctor-patient privilege. On May 28, 2021, Spinosa filed her opposition.

## II. Legal Standards Governing the Crime-Fraud Exception

The attorney-client privilege is recognized by federal courts. *United States v. Zolin*, 491 U.S. 554, 562 (1989); Fed. R. Evid. 501. The privilege enables "full and frank communication[s] between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (attorney-client privilege and the related work-product doctrine "promote unfettered communication between attorneys and their clients so that the attorney may give fully informed legal advice" and "avoid chilling attorneys in developing materials to aid them in giving legal advice and in preparing a case for trial." (citations omitted)). Given the importance of the privilege, exceptions to it are

narrow.  *See United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997), *abrogated on other grounds by Loughrin v. United States*, 573 U.S. 351 (2014).

One long-recognized exception is when legal advice furthers a client's crime or fraud. *Zolin*, 491 U.S. at 562–63.  Although "there is a societal interest in enabling clients to get sound legal advice, there is no such interest when the communications or advice are intended to further the commission of a crime or fraud."  *Richard Roe, Inc.*, 68 F.3d at 40.  Thus, a person may not claim the benefit of the privilege for communications or work product "made for the purpose of getting advice for the commission of a fraud or crime."  *Zolin*, 491 U.S. at 563 (cleaned up).  As the Supreme Court long ago put the point:  "The privilege takes flight if the relation is abused," such that "[a] client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law."  *Clark v. United States*, 289 U.S. 1, 15 (1933).

To invoke the crime-fraud exception, a party must "'demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed'—or has been attempted—'and that the communications in question were in furtherance of the fraud or crime.'"  *Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 426 (2013) (quoting *Jacobs*, 117 F.3d at 87).  The facts supporting these two required showings "must strike 'a prudent person' as constituting 'a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof.'"  *Jacobs*, 117 F.3d at 87 (quoting *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994)).

As to the first showing, an indictment establishes probable cause that a crime has been committed.  *See, e.g.*, *United States v. Levin*, No. 15 Cr. 101 (KBF), 2015 WL 5838579, at *4 (S.D.N.Y. Oct. 5, 2015) ("The Grand Jury has returned an Indictment, finding probable cause to charge the defendants with mail and wire fraud . . . .  The Government has thus satisfied the first

10

prong of the crime-fraud exception."); *United States v. Tucker*, 254 F. Supp. 3d 620, 624 (S.D.N.Y 2017) ("[T]he fact that a grand jury issued the Indictment . . . supports a finding of probable cause that a crime was committed."). But "the fact that there is probable cause to believe that a fraud or crime has been committed does not mean that" all relevant the documents "are subject to the crime fraud exception." *United States v. Ceglia*, No. 12 Cr. 876 (VSB), 2015 WL 1499194, at *2 (S.D.N.Y. Mar. 30, 2015) (quoting prior district court decision ordering *in camera* review). The Government must still satisfy the second showing.

As to the second showing, the requirement of probable cause that the communications in question furthered the crime ensures that the exception's reach is tailored and does not sweep aside the privilege as to all communications between a wrongdoer and her attorney. "The crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud." *Richard Roe, Inc.*, 68 F.3d at 40. Instead, it "applies only when the court determines that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud." *Id.* (emphasis in original). Moreover, an indictment alone does not establish that all attorney-client communications were made in furtherance of the crime alleged. *Levin*, 2015 WL 5838579, at *4. Instead, applying the exception demands a preliminary finding—satisfying a probable-cause burden—that the particular communications were in furtherance of the relevant crime. *See In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (holding that a mere temporal nexus between defendant's alleged crimes and client's communications with attorneys does not support finding that the specific withheld communications were in furtherance of crime).

Critically, however, the exception applies even if the attorney, at the time of the attorney-client communication, was unaware of the client's criminal purpose. *See Amusement Indus.*,

293 F.R.D. at 426 (collecting cases). That is because, although there must be a "purposeful nexus" between the crime or fraud and the communication, the relevant intent is that of the client. *Id.* at 427 (citation omitted). And even "facially legitimate conduct [by counsel] may constitute an action taken in furtherance of fraud in appropriate circumstances." *Levin*, 2015 WL 5838579, at *4. The Court's focus is therefore on the intent of the client, and whether she has "set upon a criminal course" in her communications with counsel. *Jacobs*, 117 F.3d at 88.

"[T]he probable cause necessary to sustain the exception is not an overly demanding standard." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97 Civ. 4978 (LMM) (HBP), 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999). And "a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege." *Zolin*, 491 U.S. at 572. Before conducting an *in camera* review "to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Id.* (cleaned up). Once such a showing is made, the "decision whether to engage in *in camera* review rests in the sound discretion of the district court." *Id.* *In camera* review is particularly appropriate when the possibility looms that some, but not all, communications between attorney and client were in furtherance of crime or fraud. *See Levin*, 2015 WL 5838579, at *5 ("[A]n *in camera* review will place the Court in the best position to make an informed decision as to whether invasion of the attorney-client privilege is justified.").

## III. Discussion

### A. Probable Cause of Crime or Fraud

The first prong of the crime-fraud exception, requiring a showing of probable cause that a crime has been committed, is easily satisfied here. In charging Spinosa with false claims, wire

fraud, and aggravated identity theft, the Indictment reflects the grand jury's finding of probable cause that Spinosa committed each of those crimes. *See Tucker*, 254 F. Supp. 3d at 624; *Levin*, 2015 WL 5838579, at *4. And the sworn Complaint which preceded the Indictment recites concrete evidence that compellingly reinforces the existence of probable cause. This evidence, recapped above, persuasively supports that, on multiple occasions, Spinosa fabricated her hours on site at the Landfill so as to establish the presence requirement for obtaining compensation from the September 11th Victim Compensation Fund. The Government has thus made the first required showing based on these familiar sources. *See Levin*, 2015 WL 5838579, at *4.

### B. Probable Cause that the Withheld Communications and Documents Were in Furtherance of Crime or Fraud

The second required showing, of probable cause that the withheld communications furthered the alleged crime, *Jacobs*, 117 F.3d at 87, is also comfortably satisfied. In particular, the BMSP emails produced in response to the Subpoena, and the Complaint's detailed account of BMSP's central role in submitting, guiding, and apparently preparing Spinosa's fraudulent claims for compensation, viewed together, make it likely that Spinosa used the law firm as a tool for executing the charged frauds.

As these materials reveal, Spinosa caused BMSP to play a significant role in submitting, and apparently preparing, her claims for compensation and benefits that, as alleged, made false representations as to her presence at the Landfill. Spinosa submitted the 2014 VCF Claim through BMSP. *See* Compl. ¶¶ 25–27; Gov't Mem. at 3–4. BMSP also advised Spinosa to apply for WTCHP medical benefits and guided her as to how to navigate the "WTCHP" route for her VCF claim after the "private physician" route initially failed to bear fruit. Compl. ¶ 10(e); *see* Aug. 2015 Email ("[T]he ultimate goal is to have your conditions found eligible by the VCF through one of the [two] processes."). The law firm, as alleged, was also the conduit for

Spinosa's submission to the VCF, in support of her claims, of at least one fraudulent supporting document: the affidavit of Officer-1.  Officer-1 disputed the knowledge of the facts attributed to him in the affidavit, denied that it was his signature on the affidavit, and denied having seen the notary on the affidavit in the several years preceding the date on which the notary ostensibly signed.  Compl. ¶ 26(a)–(d).

To be sure, as Spinosa notes, BMSP is not alleged itself to have wittingly engaged in fraud; and the evidence adduced by the Government is consistent with BMSP's having been an unknowing conduit of its client's false claims.[3]  *See* Spinosa Opp'n at 4.  But that is immaterial.  Facially legitimate actions may still be in furtherance of a criminal design.  *See Levin*, 2015 WL 5838579, at *4.  And, as noted, the lawyer need not have been aware of its client's criminal ends, or have intended to further them, for the attorney-client communications to fall within the crime-fraud exception.  *See Amusement Indus.*, 293 F.R.D. at 426.  Here, BMSP's various actions in support of Spinosa's alleged frauds—whether in guiding her as to how to utilize the claims mechanisms relating to September 11 compensation, receiving information from her that was used to populate the claims forms, or submitting the apparently bogus benefits claims on her behalf—supply a compelling factual basis on which to find that communications between the firm and Spinosa furthered her alleged frauds.  *See, e.g.*, *SEC v. Collector's Coffee Inc.*, --- F.R.D. ---, No. 19 Civ. 4355 (VM) (GWG), 2021 WL 1436664, at *8 (S.D.N.Y. Apr. 16, 2021) (crime-fraud exception applied to communications in which defendant's former employee instructed counsel "to convey statements [the former employee] knew were false to the SEC, and made false statements to [counsel] that [the former employee] knew would be conveyed to the

---

[3] BMSP itself has not responded to the Government's motion to apply the crime-fraud exception.

SEC"); *Amusement Indus.*, 293 F.R.D. at 440 (where client created false financial documents to secure financing from institutions and used attorney "as a conduit to send information," holding that communications between attorney and client regarding documents furthered fraud); *United States v. Gorski*, 807 F.3d 451, 461 (1st Cir. 2015) (reasonable to infer from counsel's assistance with preparing a response to U.S. Small Business Administration that communications with counsel were in furtherance of concealing defendant's alleged misrepresentations about his company to obtain government contracts); *United States v. Schussel*, 291 F. App'x 336, 345–47 (1st Cir. 2008) (communications between defendant and counsel regarding preparation of responses to IRS document requests fell within crime-fraud exception where client allegedly provided incorrect information to counsel in an alleged effort to deceive IRS).

Spinosa separately argues that the crime-fraud exception does not apply because the "overarching purpose" for which Spinosa retained BMSP was, ostensibly, not fraudulent. Spinosa Opp'n at 5. For two reasons, that argument fails. First, Spinosa does not identify what the benign purpose was of her retention of the firm, beyond the preparation of the benefits claims that, as alleged, were fraudulent. *See Ceglia*, 2015 WL 1499194, at *4 (finding crime-fraud exception to apply where defendant's purpose was the fraudulent one of attempting "to recover money . . . to which he was not entitled" based on a fraudulent contract). Second, even if Spinosa had identified a purpose of the representation uncompromised by the alleged fraudulent submissions, that would not make the crime-fraud exception inapplicable. Rather, it would underscore the need for a careful *in camera* review to isolate those materials implicating Spinosa's fraud from those solely relating to other dimensions of BMSP's representation of her. And here, the privilege logs produced by BMSP strongly indicate that various documents that were withheld relate to the preparation and submission of fraudulent documents on Spinosa's

15

behalf. Entries on these logs refer, for example, to "missing docs," "eligibility," "proof of presence," "claim denial," "documentation," "WTC Health Program," and "exposure time frame." These descriptions amply justify the Government's assertion that at least some—if not all—of the withheld documents relate to the fraudulent schemes of Spinosa's which BMSP appears to have furthered. *See Levin*, 2015 WL 5838579, at *4–5 (taken together, descriptions of withheld documents from defendant's privilege logs and allegations of the indictment established probable cause that attorney-client communications at issue furthered fraud).

Accordingly, there is probable cause to believe that withheld communications were made in furtherance of the alleged fraud, regardless of BMSP's knowledge or intent.

## C.   *In Camera* Review

Notwithstanding the showing of probable cause both that Spinosa committed crimes and that at least some documents withheld by BMSP reflect communications in furtherance of those offenses, the Court exercises its discretion to conduct an *in camera* review of the documents. Here, the privilege logs and produced emails strongly suggest the existence of substantial communications in furtherance of the alleged fraud, but they do not make it "so obvious" that all withheld materials were of such nature to justify an order requiring wholesale production to the Government. *Levin*, 2015 WL 5838579, at *5. Respect for the attorney-client privilege requires instead that, before any such materials are produced, the Court review them to assure that the production be narrowly tailored to capture only those found in furtherance.

The Court accordingly will conduct a prompt *in camera* review of all withheld documents, and identify those specific communications made in furtherance of the alleged crimes. *See Jacobs*, 117 F.3d at 87 (ordering *in camera* review after the government made a sufficient showing of probable cause that withheld documents furthered fraud); *Levin,* 2015 WL 5838579, at *5 (ordering *in camera* review when "the Court [did] not believe that the result [of

the withheld documents furthering fraud] is so obvious such that it would be appropriate to order defendants to immediately produce the documents at issue to the Government"); *A.I.A. Holdings,* 1999 WL 61442, at *7 (ordering *in camera* review when there existed probable cause to believe that withheld communications between client and attorney furthered the client's illegal scheme to sell information).

## CONCLUSION

For the reasons set forth above, the Court hereby orders BMSP to produce to the Court for *in camera* review, not later than Tuesday, July 6, 2021, two sets of all documents withheld on the basis of the attorney-client and/or work-product privileges.[4] To assist the Court in its review, these documents are to be produced in binders, with tabs corresponding to the numbered identifications of the withheld materials on BMSP's privilege logs.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 28, 2021
New York, New York

---

[4] In the interest of completeness, the Court will also review *in camera* documents 1520–30, which BMSP withheld pursuant to the doctor-patient privilege, while mindful that there "is no [general] doctor-patient privilege in federal law." *Hasemann v. Gerber Prods. Co.,* No. 15 Civ. 2995 (MKB) (RER), 2018 WL 5651357, at *1 (E.D.N.Y. Oct. 9, 2018); *cf. Ortiz v. City of New York,* 706 F. App'x 54, 55 (2d Cir. 2017) (summary order) ("Psychotherapist-patient communications arse privileged under Federal Rule of Evidence 501.").