

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 23, 2021

<u>BY CM/ECF</u>
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
30 Foley Square
New York, New York 10007

      Re:    *United States v. Sally Spinosa*, 21 Cr. 206 (PAE)

Dear Judge Engelmayer:

      The Government respectfully submits this letter in advance of the sentencing for defendant Sally Spinosa in the above-referenced matter, which is currently scheduled for December 1, 2021, at 10:30 a.m. For the reasons set forth below, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 6 to 12 months' imprisonment is sufficient but not greater than necessary to serve the purposes of sentencing.

## I. Offense and Relevant Conduct

      As set forth below, over the course of nearly a decade, Spinosa, a Sergeant in the NYPD, lied in false claims to two public programs and one civil lawsuit. Spinosa's lie was substantially overstating the amount of time she worked at the Fresh Kills Landfill in Staten Island, New York (the "Landfill") in the aftermath of the September 11, 2001, attacks. When one public program denied her claim, she took her fraud to another program. When one of her supervisors at the NYPD asked her to provide proof before he would write an affidavit attesting to her time at the Landfill, she created and submitted a fraudulent affidavit purportedly written by him. On August 4, 2021, Spinosa pleaded guilty pursuant to a plea agreement to one count of theft of government funds, in violation of 18 U.S.C. §§ 641 and 2, acknowledging her long-running fraud.

    A.  <u>Employment at the NYPD</u>

      From July 7, 1986 to July 5, 2019, Sally Spinosa was an officer with the New York Police Department ("NYPD"). Presentence Investigation Report ("PSR") ¶ 9. As relevant here, from January 27, 2000, until July 5, 2019, Spinosa was a Sergeant in the investigations unit of the Patrol Services Bureau of Staten Island (the "Staten Island Investigations Unit"). *Id.* The Staten Island Investigations Unit handled violations of NYPD protocol that did not rise to the level of an investigation by the Internal Affairs Bureau. *Id.*

B.   <u>False Statements to the September 11th Victim Compensation Fund</u>

The September 11th Victim Compensation Fund (the "VCF") was created by Congress to provide compensation for any individual who suffered physical harm or was killed as a result of the terrorist-related aircraft crashes of September 11, 2001, or the debris removal efforts that took place in the immediate aftermath of those crashes.

On June 27, 2014, Spinosa, through her attorney, submitted a claim to the VCF stating that she was entitled to compensation for non-economic losses as a result of her work at the Fresh Kills Landfill in Staten Island, New York (the "Landfill"), following the attacks of September 11, 2001. *Id.* ¶ 15. If Spinosa met the VCF's requirements, she was eligible to receive between $20,000 and $90,000, depending on the severity of her medical conditions. *Id.* ¶ 16. However, based on Spinosa's specific claimed medical conditions and the seriousness of those conditions, Spinosa most likely would have received $20,000 to $35,000. *Id*.

In her VCF claims form, Spinosa stated that she worked at the Landfill every day from September 20, 2001, to November 20, 2001, for two hours each day, *i.e.*, 124 hours total. *Id.* ¶ 19. Spinosa provided this date range in three different places on two forms that were part of her claims packet. *Id*. She stated that she worked at the Landfill for two hours per day in two additional places on two forms that were part of her claims packet. *Id*.

In fact, Spinosa was present at the Landfill for little or no time during the relevant period. *Id.* ¶ 20. First, Spinosa was pregnant at the time and had placed herself on limited duty. During limited duty, officers were largely confined to working in the office. Second, members of Spinosa had few, if any, investigations at the Landfill during that period. Third, Spinosa's supervisors stated that they would not have sent any officers on limited duty – or any officers that were pregnant but not on limited duty – to work at the Landfill. Fourth, a supervisor at the Landfills stated that he was not aware of any pregnant officers working at the Landfill, which even then was known to be a highly, visibly toxic environment. Fifth, the Staten Island Investigation Unit logs available show other officers traveling to the Landfill but show Spinosa rarely leaving the office for work and never traveling to the Landfill. Sixth, records from the Landfill do not show Spinosa ever signing-in for work at the Landfill. *See generally id.* ¶¶ 20-21.

In addition, Spinosa submitted two affidavits to support her presence at the Landfill, including one from her NYPD supervisor in 2001 and 2002 ("Officer-1"). In that affidavit, Officer-1 ostensibly wrote that he and Spinosa "frequently visited the site in accordance to supervise subordinates." *Id.* ¶ 17. In fact, however, Officer-1 did not write, sign, or know about that affidavit bearing his name and signature that Spinosa submitted with her VCF claim. *Id.* ¶ 18. In fact, after Officer-1 retired from the NYPD in 2007, Spinosa approached him about signing a proof-of-presence document at some point after 2007, when he retired from the NYPD. *Id.* Before agreeing, Officer-1 asked Spinosa for support for her presence at the Landfill. Spinosa never provided the support or raised the topic again. *Id*.

In October 2015, the VCF denied Spinosa's claim because she did not claim to work at the Landfill for a sufficient number of hours. *Id.* ¶ 22. Spinosa then sought to have her medical conditions certified by the World Trade Center Health Program. *Id*.

C.  <u>False Statements to the World Trade Center Health Program</u>

The WTCHP is a program created by Congress in 2010 that provides, among other things, no-cost monitoring and diagnostic care for a wide set of individuals with even minimal exposure at relevant sites. Individuals who develop medical conditions related to their exposure may then seek to have their conditions "certified" by the WTCHP, which would make them eligible for extensive treatment benefits through the WTCHP. The WTCHP is funded through appropriations from Congress.

On April 6, 2010, Spinosa visited the World Trade Center Health Program's center at Mt. Sinai hospital in Staten Island. *Id.* ¶ 24. There, Spinosa sat down for an "Exposure Assessment" interview in which Spinosa was asked about her exposure at the Landfill. Spinosa said the following:

- Spinosa worked at the "WTC rescue and recovery effort" from September 12, 2001, to September 1, 2002;

- Spinosa worked on the recovery efforts for two hours each day from September 12-30, 2001. Spinosa worked on the "WTC rescue, recovery, debris clean-up or related support services" for 31 days in October 2001, 20 days in November-December 2001, and 60 days from January to June 2002. She worked for an average of 2 hours per day;

- Spinosa worked on the World Trade Center recovery efforts as an employee of the NYPD, not as a volunteer. In September 2001, her work consisted of "supervising the dumping of the remains of bodies"; and

- Spinosa came in contact with human remains during each period from September 2001 to June 2002. She also came into contact with mold and chemicals.

*See id.* ¶¶ 24-25.

As set forth above, after Spinosa's VCF claim was denied, she went back to the WTCHP to have her medical conditions certified for treatment, which would have also made her eligible for VCF compensation. January 2017, as part of the WTCHP's certification process, Spinosa had a "treatment progress" meeting with Dr. Bruno Manduca at Mt. Sinai. *Id.* ¶ 27. During the meeting, Spinosa told Dr. Manduca she was assigned to the Landfill a few days after September 11, 2001; that she was not at Ground Zero because she was pregnant; that she was supervising NYPD officers at the Landfill; that she was never given a mask to wear; and that she was at the Landfill for 4-5 months. *Id.* Dr. Mandua later wrote a letter recommending that Spinosa's asthma and chronic rhinosinusitis be certified, based on his medical assessment and his review of her 2010 Exposure Assessment interview. *Id.*

In August 2017, the WTCHP certified Spinosa's asthma and chronic rhinosinusitis for treatment, based in part on Dr. Manduca's assessment. Spinosa subsequently returned to Dr. Manduca to have her gastroesophageal reflux disease ("GERD") certified. *Id.* ¶ 28. Dr. Manduca recommended that her GERD be certified, and, in August 2017, the WTCHP certified that condition. *Id.*

After receiving her WTCHP condition certification letters in 2017 and 2018, Spinosa submitted those letters to the VCF. These letters renewed her VCF claim, except this time the certification letters from the WTCHP meant that the VCF would very likely deem her conditions eligible for compensation and move on to setting compensation.

D.   <u>False Statements in Civil Lawsuit</u>

On October 20, 2006, Spinosa, through her attorneys, filed a civil complaint in the United States District Court for the Southern District of New York as part of the litigation regarding the September 11th attacks. *Id.* ¶ 11; s*ee Sally Spinosa and Richard Spinosa v. 1 World Trade Center LLC et al.*, 06 Cv. 12546 (AKH), 21 Mc. 100 (AKH). On March 21, 2008, Spinosa filed an amended civil complaint in which she provided a more detailed claim about her presence. Spinosa wrote that "[i]n the period from 9/20/2001 to 8/1/2002 the Injured Plaintiff worked for the New York Police Department (NYPD) as a Sergeant" at the Fresh Kills Landfill. PSR ¶ 12. Spinosa wrote that she was at the landfill for "[a]pproximately 2 hours per day; for [a]pproximately 40 days total." For the same reasons her statements to the VCF and WTCHP were false, her statement in the civil lawsuit was false. *Id.* On September 22, 2010, Spinosa settled her civil claims in exchange for $46,362.30. *Id.* ¶ 13.

## II.  Procedural History and Stipulated Guidelines Range

On January 6, 2021, the Government obtained a Complaint charging Spinosa with one count of submitting false claims, in violation of 18 U.S.C. §§ 287 and 2; one count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and one count of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2. Dkt. No. 1 (the "Complaint"). On January 7, 2021, Spinosa self-surrendered to the United States Marshals Service, was presented before a Magistrate Judge, and was released subject to bail conditions.

On March 25, 2021, the grand jury returned Indictment 21 Cr. 206 charging Spinosa with the same counts contained in the Complaint. On August 4, 2021, the defendant pleaded guilty pursuant to a plea agreement to Count One in a Superseding Information charging one count of theft of government funds, in violation of 18 U.S.C. §§ 641 and 2. The parties agreed in the Plea Agreement, and the Probation Office concurred in the PSR, that the appropriate Guidelines range is 6 to 12 months' imprisonment. Plea Agreement at 3; PSR at 28.

In the Plea Agreement, Spinosa agreed to pay restitution in the amount of $54,695.81 and agreed to forfeit $8,333.51. Plea Agreement at 2. The restitution amount reflects the award Spinosa received from the civil lawsuit ($46,362.30) and the value of medical and prescription benefits obtained from the WTCHP ($8,333.51) The forfeiture amount reflects only the value of medical and prescription benefits obtained from the WTCHP ($8,333.51). In the Plea Agreement, Spinosa stipulated that the loss attributable to her offense pursuant to U.S.S.G. § 2B1.1 included the loss to the civil lawsuit and WTCHP, described above, and the attempted loss to the VCF ($20,000). *See* Plea Agreement at 2 (stipulating that "the loss and attempted loss from the offense charged in Count One is $74,695.81").

4

## III. Discussion

### A. Applicable Law

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. The Court Should Impose a Sentence Within the Stipulated Guidelines Range

In this case, the nature and circumstances of the defendant's offense and the need to promote respect for the law, and to deter future criminal conduct by others all weigh in favor of a sentence of imprisonment within the Stipulated Guidelines Range.

*First*, the seriousness of the defendant's fraud supports a substantial sentence. The defendant exploited her role at the NYPD, where other officers legitimately performed work in the September 11th recovery effort and sustained injuries. Fraud against government programs has a serious effect on their ability to provide relief to those who need it. For example, in 2019, the VCF nearly ran out of funds and had to "make a significant reduction in awards." *See Message from Special Master Rupa Bhattacharyya*, VCF.gov (Feb. 15, 2019),

https://www.vcf.gov/blog/message-special-master-rupa-bhattacharyya-1. Although Congress ultimately renewed and re-funded the VCF after a significant public campaign, the VCF's struggles show the harm that fraudulent claims like Spinosa's can take on public programs.

Moreover, the defendant's fraud was not an isolated incident. Rather, it was a scheme over nearly a decade to defraud multiple entities. Spinosa misrepresented the time she spent at the Landfill at least five separate times between 2008 and 2017: (1) in March 2008, in her amended civil complaint; (2) in April 2010, in her WTCHP Exposure Assessment interview and her physician appointment the same day; (3) in June 2014, when she filed her initial VCF claim; (4) in September 2014, in the fraudulent Officer-1 affidavit; and (5) in January 2017, in her initial meeting with her WTCHP physician. PSR ¶¶ 12, 15, 17, 24-26, 27. Indeed, Spinosa doubled-down on her misrepresentations when the VCF asked her for supporting documents. Specifically, after Spinosa submitted her initial VCF claim in 2014 without any affidavits, the VCF asked for supporting documentation and she submitted the fraudulent Officer-1 affidavit, without his knowledge or consent. *See* Complaint ¶¶ 10(g). Likewise, when Spinosa approached Officer-1 and asked him to write a supplemental supporting affidavit, he asked for supporting proof and she never brought up the topic again. PSR ¶ 18. Spinosa's fraud was deliberate, sophisticated, and willful, and warrants a significant sentence.

*Second*, a substantial sentence is also necessary to afford adequate deterrence of criminal conduct by others who may seek to engage in similar schemes. False claims against the VCF and the WTCHP and in civil litigation related to September 11 are difficult to detect due to the age of the underlying conduct and the large volume of claims. As of August 2021, the VCF had issued awards to over 40,000 individuals. *See September 11th Victim Compensation Fund 20th Anniversary Special Report* at 20 (Sept. 2021).[1] As of September 2021, the WTCHP had 82,331 responder enrollees and 31,972 survivor employees. *Program Statistics*, CDC.gov.[2] Spinosa's fraud was made even more difficult to detect because she submitted a fraudulent affidavit from Officer-1. Likewise, Spinosa exploited the class action-status of the civil lawsuit and the WTCHP's certification process, which relied on representations by Spinosa. It is critical for these programs to receive truthful submissions so that they can direct funds to the individuals who have genuine, September 11th-related injuries and health conditions. The sentence imposed in this case should send a message to those who make seek to make false claims that such conduct will not be tolerated and serious consequences, such as incarceration, will result.

---

[1] https://www.vcf.gov/sites/vcf/files/media/document/2021-09/2021%20VCF%20Special%20 Report.pdf (last visited Nov. 23, 2021).
[2] https://www.cdc.gov/wtc/ataglance.html (last visited Nov. 23, 2021)

## IV.  Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Stipulated Guidelines Range of 6 to 12 months' imprisonment. This sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Kedar S. Bhatia
Catherine E. Ghosh
Assistant United States Attorneys
(212) 637-2465 / 1114